Argued and submitted November 6, 1990, the judgment affirmed as to defendant's conviction for aggravated murder and robbery in the first degree; sentence of death vacated and remanded to the circuit court for further proceedings May 2, reconsideration denied September 24, 1991

## STATE OF OREGON,
### *Respondent,*

*v.*

## JASON WAYNE ROSE,
### *Appellant.*

## (CC 10-88-05312; SC S36201)

810 P2d 839

Diane L. Alessi, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief were Paul J. De Muniz and Garrett, Seideman, Hemann, Robertson & De Muniz, Salem.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder,

Solicitor General, Brenda J Peterson and Douglas F. Zier, Assistant Attorneys General, Salem.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

This is an automatic and direct review of a judgment of conviction of aggravated murder and sentence of death. *Former* ORS 163.150(1)(f) (1987) (now ORS 163.150(1)(g)). Defendant seeks reversal of his conviction of aggravated murder. Alternatively, he requests this court to vacate his sentence of death. He also seeks reversal of his conviction of robbery in the first degree.[1] We affirm defendant's convictions. We vacate his sentence of death and remand this case to the circuit court for further proceedings consistent with this opinion.

### SUMMARY OF FACTS

The jury found defendant guilty. Therefore, we view the evidence in the light most favorable to the state. *State v. Stevens,* 311 Or 119, 121, 806 P2d 92 (1991).

On June 1, 1988, children playing in a wooded area in Springfield, Oregon, found a human body covered with brush and a board. Near the victim's body the police found a turquoise ring, a lapel or hat pin, and human hair matching the victim's. The ring and pin were identified as being the victim's property. Several hundred yards from the body the police found a campsite, cooking pots, utensils, multi-colored candles arranged in a circle, and a machete which later was identified as belonging to defendant.

John Ray Jones was a friend of defendant. Michelle Slagle was Jones' friend. After the victim's body was found, defendant and Jones talked with Slagle about the victim's death. Jones told Slagle that he and defendant had killed the victim. Slagle testified that defendant said that "they beat * * * her, they choked her, kicked her ribs in" and that he "used a machete to choke her."

Robyn Newman worked with defendant and Jones. Newman testified that defendant told her that he knew something about the victim's death, that he and Jones had to

---

[1] ORAP 12.10(2) provides:

"If, in addition to a conviction for aggravated murder forming the basis for the death sentence, a defendant is convicted of one or more charges arising from the same charging instrument, the Supreme Court shall have jurisdiction to review any such conviction without the filing of a notice of appeal."

kill the victim in order to get money, that the victim "had a price on her head," and that it is "easy to kill a friend, especially if you know them and they don't know what's going on, because you can get close to a friend." On different occasions, Newman saw defendant and Jones with "rune stones."[2] Defendant and Jones would throw the "rune stones" on the ground and then with the aid of a book, interpret their meaning. Defendant told the police that "the rune said that, if we didn't kill [the victim], we would die."

Janice Johnson also saw defendant using the "rune stones." Defendant told her that he used the stones to find out whom he would kill next and that sometimes he had to "hurt good people or kill them."

By the time the police had focused their investigation on defendant and Jones, the two men had gone to Arizona. The police located them there, and, on June 13, 1988, Captain Smith and Detective Bond flew to Arizona and arrested defendant and Jones for murder. Defendant was advised of his *Miranda* rights, which he said that he understood and was willing to waive. He agreed to talk to the police about the victim's death.

During the interview defendant gave several versions of the cause of the victim's death. First, he said he knew the victim but did not know how she died. Second, he said he had seen the victim on the day she died, but that he did not know how she died. Third, he said he was with the victim when a tree branch fell, killing her and he got scared, covered the body, and left. Fourth, he said he threw a wooden spear that he was carrying and that the spear struck a tree branch which broke and fell on the victim, killing her. When Detective Bond told defendant that Jones had confessed to murder and had implicated defendant, defendant said that Jones had killed the victim and that he, himself, was only an "accessory" to her death. Defendant said he did not want to kill the victim, but he had put a "choke hold" on her until she became

---

[2] We understand "rune stones" to be small stones marked with "runes," characters of early alphabets used by Germanic tribes and peoples found in the Scandinavian north and remote parts of Sweden (as opposed to the Greek and Latin alphabets). Although their primary purpose was to give spoken language a fixed form, throughout their history runes have commonly been considered to be associated with magic. 19 Encyclopedia Britannica, *Rune,* 754-55 (1971).

unconscious and that after he laid her on the ground, Jones "whacked" her on the back of the neck twice with a machete.

Defendant said the victim was a "black witch,"[3] who was a friend of Vaughn Shelton, a person who had threatened to kill defendant. Defendant said Jones had wanted the victim dead and that, after defendant had the victim in a "sleeper hold," Jones said, "I give you this sacrifice in the name of Arioch."[4] Defendant said he and Jones then placed a spear across the victim's neck and stood on both ends of it for ten minutes. Then they removed the victim's jewelry and sacrificed it to "some god." Defendant said that they then removed the victim's blouse and ripped her pants to make it appear as though she had been raped, and then they put her body in the shrubs and covered it with a board.

On arriving back in Oregon, Smith and Bond took defendant and Jones to the scene of the crime, where both men agreed to reenact the murder. Three reenactments of the murder were recorded on a single videotape (State's Exhibit 28). The first reenactment was by defendant alone, the second was by Jones alone, and the third was by defendant and Jones together. A mannequin was used to portray the victim in all three reenactments.

We summarize the first reenactment, rendered by defendant alone. On or about May 30, 1988, defendant, Jones, and the victim went to a campsite that defendant and Jones had set up earlier. Defendant and the victim went into the bushes to have intercourse. About 45 minutes later, defendant heard "voices and footsteps." He thought that Vaughn Shelton might be looking for him. Defendant left the victim to find Jones. Defendant and Jones then took "spears" and began looking for Shelton. Soon thereafter, the victim came up behind defendant, startling him. He turned and threatened her with his spear. Jones asked defendant, "Should we kill her now?" Defendant answered, "Not yet. But I want the

---

[3] Later, defendant told the police that he thought one reason why the victim did not struggle much while they were killing her was because he told her that she was a black witch and that "we're giving you the greatest honor to sit at the right hand of Arioch in hell as a sacrifice."

[4] Defendant told the police that Jones was an apprentice "who served Arioch, a god of chaos and evil worshiped by human sacrifice." Defendant described himself as a "necromancer" (someone who conjures up spirits of the dead).

bitch dead — the runes said so, and we don't disobey the runes."

Later, the victim told defendant and Jones that she was working for Shelton. Defendant became very angry and stated, "Bitch, you shouldn't have told me that. I don't want to kill you, but it looks like we have to now to survive." Defendant grabbed the victim around her neck and "wrenched down hard." She struggled but finally became unconscious, and defendant laid her face down on the ground.

Defendant removed the sweater that the victim was wearing, which he had loaned to her earlier in the evening to keep warm. When he pulled the sweater off, her jacket also came off. Defendant said, "In the name of Arioch, we grant you your sacrifice, now!" Jones struck the victim twice on the back of her neck with a machete. Defendant walked toward the victim. As he did, her body rolled over so that it was face up. The victim was still breathing and she started to regain consciousness. Defendant "karate-chopped" her in the throat and brought his elbow down into her stomach just below her ribs. Defendant checked the victim's pulse and felt that she still had one. He straddled her body and choked her with his hands for five to ten minutes.

Jones then suggested that they lay a spear across her neck. Defendant agreed and the men stood on both ends of the spear for about 20 minutes talking about what the "rune stones" had said to them. Defendant and Jones checked the victim's body. They did not feel a pulse and her body felt cold. Nonetheless, to be certain that she was dead, they stood on the spear for another five minutes talking about "what the runes said to do." The cause of death was asphyxia due to strangulation.

Defendant took the victim's three necklaces, and he and Jones took her rings. The two men then threw the body down a gully. While defendant performed a ritual to keep evil spirits away, Jones covered the body with brush and a board. They placed the necklaces in the victim's purse, and carried the purse, the rings, the sweater, and the victim's jacket back to their campsite. Defendant built a fire and threw some of the victim's jewelry into the fire as a sacrifice to two gods who take "jewelry and crafted items as sacrifices." Defendant and Jones kept the jewelry that they did not sacrifice and gave

some of it to their respective girlfriends.[5] Defendant kept the victim's cosmetics bag, which he used to make a "resin" (marijuana) kit, and her jacket, which he altered and wore.

After defendant reenacted the victim's murder, Detective Bond asked him how he felt about killing the victim. Defendant responded that he had "passed through the seventh gate," which, he explained, was a human sacrifice, and that it made him feel good. Defendant told Bond, "She was hard to kill" and that "this was a human sacrifice."

A discrepancy exists between defendant's first reenactment of the murder and the third reenactment by defendant and Jones together. In the first reenactment, defendant said the men had taken the victim's jewelry after she was dead. In the third reenactment, defendant said the victim was still alive when they took her jewelry. Jones agreed with the latter statement.

### Indictment

Defendant was charged with one count of aggravated murder based on four different theories (murder in the course of and in furtherance of robbery in the first degree; murder in the course of and in furtherance of kidnapping; murder in the course of or as a result of intentional maiming; and murder in the course of or as a result of intentional torture). He also was charged with robbery in the first degree.[6] A jury returned a unanimous verdict of guilty of aggravated murder (in the course of and in furtherance of robbery in the first degree) and of robbery in the first degree. In the penalty phase, the jury answered "yes" to the questions posed by *former* ORS 163.150(1)(b). Thereafter, the trial court merged defendant's convictions for purposes of sentence and then entered a judgment of conviction and sentence of death.

## ASSIGNMENTS OF ERROR

### A.  GUILT PHASE

---

[5] Slagle identified a ring that she received from defendant and another ring and necklace that she received from Jones. Defendant gave his girlfriend another of the victim's rings. Defendant wore one of the victim's necklaces for a while before losing it.

[6] The indictment against John Ray Jones was identical to the indictment against defendant.

*Judgment of Acquittal*

Defendant contends that the trial court erred in denying his motion for judgment of acquittal on the charge of robbery in the first degree and aggravated murder.

Defendant concedes on appeal that the evidence at trial shows that he and Jones used physical force upon the victim and that they committed theft of her jewelry, clothing, and personal effects. He argues, however, that "the evidence also shows that the force he and Jones used upon the victim was only for the purpose of causing her harm or death and not with the intent of preventing or overcoming her resistance to the theft. The removing of [the victim's] jewelry and personal effects occurred *after* [the victim] was dead, apparently as an afterthought." He further argues that, because no causal relationship was shown between the physical force used on the victim and the theft of her property, the evidence was not sufficient for the jury to find beyond a reasonable doubt that he was guilty of robbery. He relies primarily on *State v. Jackson,* 40 Or App 759, 596 P2d 600 (1979), which held that for there to be a robbery, there must be a relationship between the force used and the theft committed. Defendant further argues that, because the evidence was not sufficient for the jury to have convicted him of robbery in the first degree, his conviction of aggravated murder based on that theory of felony murder also must be reversed.

We review challenges to the sufficiency of evidence solely to determine whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. Our decision is not whether we believe defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for the jury to so find. *State v. King,* 307 Or 332, 339, 768 P2d 391 (1989).

We first consider defendant's conviction of robbery in the first degree. ORS 164.415 provides in part:

"(1)   A person commits the crime of robbery in the first degree if the person violates ORS 164.395 and the person:

"* * * * *

"(c)   Causes or attempts to cause serious physical injury to any person."

ORS 164.395 provides in part:

> "(1) A person commits the crime of robbery in the third degree if in the course of committing or attempting to commit theft the person uses or threatens the immediate use of physical force upon another person with the intent of:
>
> "(a) Preventing or overcoming resistance to the taking of the property * * *[.]"

In order to sustain a conviction for robbery in the first degree in the context of this case, the state had to prove beyond a reasonable doubt, in addition to jurisdiction and venue, that defendant (1) in the course of committing theft; (2) used physical force upon the victim; (3) with the intent of preventing or overcoming her resistance to the taking of the property; and (4) that, in the process, he caused her serious physical injury. ORS 164.415; ORS 164.395.

The first, second, and fourth elements noted above are not at issue in this case. Respectively, defendant admits that he committed a theft of the victim's property, that he used physical force upon her, and that he caused her serious physical injury. Defendant's assertion is that the third element was not proven. He argues that there is no evidence to prove that he used physical force upon the victim *with the intent* of preventing or overcoming her resistance to the theft of her property. Thus, he argues, there was no proof of the requisite causal relationship between the physical and mental elements of the crime of robbery.

Evidence of a defendant's intent is rarely, if ever, proven by direct evidence. Intent is an operation of the mind, and it is seldom susceptible of direct proof. This subjective fact is usually established by a consideration of objective facts, and from these objective facts an ultimate conclusion is drawn. *State v. Elliott,* 234 Or 522, 528-29, 383 P2d 382 (1963). A defendant does not telegraph his or her intent for the world to see, and there is no stopwatch keeping track of when a defendant's intent to commit a specific act is formed. For the reasons stated below, we conclude that in this case there is sufficient circumstantial evidence surrounding defendant's theft of the victim's property and his use of force upon her that the jury properly could have inferred that his use of that force was with the intent of preventing or overcoming her resistance to his theft of her property.

■      Although the state is not required to prove a defendant's motive for a charged crime, it may do so.[7] The issue here, however, is not why defendant did what he did, *i.e.,* his motive, but whether he committed the proscribed acts with the requisite intent. Nonetheless, evidence of a defendant's motive may be relevant, as circumstantial proof, to the issue of intent. If, for example, in this case the jury may infer that defendant had a motive to steal the victim's property before or during the criminal episode involving both a taking of the victim's property and the use of physical force on the victim, the jury may also infer that defendant's use of force was accomplished, at least in part, with the intent to prevent or overcome the victim's resistance to that theft.

Evidence was presented in this case of an array of motives for defendant's theft of the victim's property both before and during the criminal episode. Defendant told Newman that he and Jones "might know something about the [victim's] murder"; and that "it's easy to kill a friend, especially if you know them and they don't know what's going on, because you can get close to a friend"; that "they needed money and they were looking for a place to live." Defendant also told Newman that the victim had a "price on her head" and that they "had to kill [the victim] in order to get the money." Defendant admitted sacrificing some of the victim's jewelry to two gods who take "jewelry and crafted items as sacrifices," giving some of it to Slagle and Adams, and keeping some of it for himself.

In context, the jury was entitled to infer that defendant and Jones stole the victim's property to get money. The jury also was entitled to infer that defendant and Jones stole the victim's property to sacrifice it to gods who take "jewelry and crafted items as sacrifices," and that the sacrifice of the victim and of her property were part of a scheme to placate their gods. The jury also was entitled to infer that defendant and Jones stole the victim's property to give it to their girlfriends, or to keep for their own use. Additionally, a

---

[7] Motive is the cause or reason that moves the will and induces action. Motive is not an element of the crime of robbery and the state is not required to prove motive. If evidence of motive is offered at trial, then motive is but a circumstance to be considered with other evidence surrounding the commission of the crime and to be given only such weight as the trier of fact deems proper. *State v. Walker,* 244 Or 404, 411-12, 417 P2d 1004 (1966).

defendant's possession of a victim's property after a victim's murder is some evidence of the defendant's motive underlying the homicide.[8] Those are circumstances that are open, of course, to explanation, but are nonetheless circumstances that the jury is entitled to consider on the question of motive.

The jury was not bound to accept defense counsel's argument[9] that when defendant and Jones used physical force upon the victim they did so only for the purpose of causing her harm or death and not also with the intent of preventing or overcoming her resistance to the theft of her property or that they formed the intent to take the victim's property only after she was dead, and then as a mere afterthought. We conclude that the evidence was sufficient to permit the jury to have found beyond a reasonable doubt that, in the course of committing theft of the victim's property, defendant and Jones used physical force on the victim with the intent of preventing or overcoming her resistance to the theft, and that, in the process, they caused the victim serious physical injury. ORS 164.395; ORS 164.415. The trial court, therefore, did not err in denying defendant's motion for judgment of acquittal on the charge of robbery in the first degree.

■ We next consider defendant's conviction of aggravated murder based on a robbery theory of felony murder. The state's theory of aggravated murder of which defendant was convicted is based on the following statutes.

ORS 163.095 defines aggravated murder in relevant part:

> "As used in ORS 163.105 and this section 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:
>
> "* * * * *
>
> "(2)(d)   Notwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b)."

---

[8] *State v. Gibson,* 252 Or 241, 244-46, 448 P2d 534 (1968); *State v. Weston,* 102 Or 102, 129-30, 201 P 1083 (1921); *State v. Humphrey,* 63 Or 540, 550, 128 P 824 (1912); *State v. Wintzingerode,* 9 Or 153 (1881).

[9] Defendant did not testify at his trial.

ORS 163.115 provides in part:

"(1) Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"* * * * *

"(b) When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants:

"* * * * *

"(G) Robbery in the first degree as defined in ORS 164.415[.]"

In order to sustain a conviction for aggravated murder in the context of this case, the state had to prove beyond a reasonable doubt that defendant personally and intentionally committed the homicide in the course of and in furtherance of robbery in the first degree. ORS 163.115(1)(b); ORS 163.095(2)(d). The relevant question is not whether the victim's death preceded, occurred during, or followed the robbery, but whether the robbery and the defendant's acts that caused the victim's death are so related in time, place, and circumstances that the trier of fact could find beyond a reasonable doubt that the homicide occurred "in the course of and in furtherance of" the robbery.[10] *State v. Little,* 249 Or 297, 310-11, 431 P2d 810 (1967), *cert den* 390 US 955 (1968); *State v. Jensen,* 209 Or 239, 262, 289 P2d 687, 296 P2d 618, *cert den* 352 US 948 (1956); *State v. McCarthy,* 160 Or 196, 202, 83 P2d 801 (1938); *State of Oregon v. Brown,* 7 Or 186 (1879); 2 LaFave and Scott, Substantive Criminal Law § 7.5(f), at 228 (1986). Something more than a mere coincidence of time and place, however, is necessary to show that the homicide occurred "in the course of and in furtherance of" the felony. There must have been some causal relationship between the robbery and the homicide. *State v. Schwensen,* 237 Or 506, 516-17, 392 P2d 328 (1964); LaFave and

---

[10] To the extent that defendant appears to argue that the theft of property after a victim has been killed may never be felony murder, defendant is wrong. ORS 163.095(2)(d); *State v. Little,* 249 Or 297, 310-11, 431 P2d 810 (1967), *cert den* 390 US 955 (1968).

Scott, *supra,* § 7.5(f), at 222 (there must be some causal relationship between the felony and the death).

There is evidence in the record from which the jury could have inferred that the physical force used by defendant and Jones in the commission of robbery in the first degree was the same force they used to kill her. There is evidence in the record from which the jury could have inferred that the robbery and the homicide were part and parcel of an overall scheme to rob the victim and to kill her. As noted, defendant admitted that he personally and intentionally killed the victim and that he committed theft of her property.

Again, viewing the evidence in the light most favorable to the state, we conclude that the evidence was sufficient to permit the jury to have found the essential elements of the crime of aggravated murder beyond a reasonable doubt. The trial court, therefore, did not err in denying defendant's motion for judgment of acquittal on the charge of aggravated murder.

*Instruction*

■ Defendant contends that the trial court erred in instructing the jurors that they need not all agree on the factual circumstances making the homicide aggravated murder. Defendant excepted to that instruction on the ground that it did not require that all 12 jurors agree on a particular theory of aggravated murder. Defendant argues that his right to a unanimous verdict on the aggravated murder count was violated by that instruction. He relies primarily on *State v. Boots,* 308 Or 371, 780 P2d 725 (1989).

The state concedes, and we agree, that the trial court erred in giving the instruction. The state argues, however, that the error was harmless, because all 12 jurors, in fact, agreed that the murder was committed personally and intentionally and in the course of and in furtherance of robbery in the first degree.

At the close of the trial, the trial court gave the jurors a special verdict form. As to each of the state's four theories of aggravated murder, the court instructed the jury to indicate on the verdict form whether they all agreed that the particular theory had been proved. If the vote was not unanimous that a particular theory had been proved, the jury could

answer a "fifth question" indicating that all 12 agreed that aggravated murder had been proved, but that less than twelve agreed as to the aggravating circumstance.

The jury returned the following verdict:

"Count 1, guilty of aggravated murder. Count 2, guilty of robbery in the first degree."

The special verdict form reflected that all 12 jurors agreed that defendant committed aggravated murder in the course of and in furtherance of robbery in the first degree. Questions 2, 3, and 4 on the special verdict form, dealing with the state's three other theories of aggravated murder, were answered "no." The "fifth question" was not answered. The trial judge asked each juror if he or she concurred that the defendant was guilty of aggravated murder and if he or she concurred that the murder was committed in the course of and in furtherance of robbery in the first degree. Each juror answered "yes" to both questions. The presiding juror reported that the jury's verdict on the robbery in the first degree count was unanimous.

In *State v. Boots, supra,* this court held that an instruction very similar to the instruction given in this case was erroneous and that, under the circumstances of that case the error required reversal of the defendant's aggravated murder conviction. This court emphasized that to convict a defendant of aggravated murder the jury must agree unanimously on the particular factual circumstance that makes the homicide aggravated murder. 308 Or at 377-79. The record in *Boots* did not show whether all 12 jurors had agreed on one or both of the two theories of aggravated murder alleged by the state in that case. In *Boots,* the jury was neither given a special verdict form nor was it polled as to whether the jurors agreed unanimously on one or both of the state's theories of aggravated murder. We conclude that this case is factually distinguishable from *Boots*. The issue presented here is not whether the trial court erred in giving the instruction — it did — but whether the error requires reversal.

We conclude that it does not. The record shows that the jurors unanimously agreed both as to defendant's guilt of robbery in the first degree and as to the factual circumstance that made the murder aggravated. Thus, our concern in *Boots*

— that the defendant may have been deprived of his constitutional right to a unanimous verdict in a capital case — is obviated by the verdict returned here.

Defendant has not identified any prejudice that may have resulted from the trial court's erroneous instruction, and we perceive none. We conclude, therefore, that the error was harmless. *State v. Walton,* 311 Or 223, 231, 809 P2d 81 (1991). We also conclude, as required by the federal constitution, that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705, *reh'g den* 386 US 18 (1967).

### Videotaped Reenactments

■   Defendant contends that the trial court erred in permitting the introduction into evidence of an unedited version of State's Exhibit 28, which contains a reenactment of the homicide by Jones alone. He argues that the jury was given the means to view State's Exhibit 28 in the jury room. Because Jones was not a witness whom defendant could cross-examine, *Bruton v. United States,* 391 US 123, 88 S Ct 1620, 20 L Ed 2d 476 (1968), defendant argues that *if* the jury viewed the Jones reenactment, then his confrontation rights under Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution were violated.

At trial, the prosecutor first offered State's Exhibit 28, the unedited videotape, in evidence. The prosecutor then expressly limited his offer to the first and third videotaped reenactments, those by defendant alone and by defendant and Jones together. Defense counsel told the trial court that, with the understanding that the second reenactment, made by Jones alone, was not being offered, he had no objection to State's Exhibit 28.

The viewing of State's Exhibit 28 by the jury occurred as follows: after showing the jury the first reenactment, by defendant alone, the prosecutor asked for a recess, during which he forwarded the videotape past the second reenactment by Jones to the start of the third reenactment by defendant and Jones together. After the recess, the prosecutor showed the jury the third reenactment.

The prosecutor later expressed concern to the trial court that all three reenactments were on a single videotape.

He warned the court that this might present a problem if the jury viewed State's Exhibit 28 in the jury room because the second reenactment recorded on the exhibit had not been offered by the state. The prosecutor suggested that an edited copy of State's Exhibit 28, containing only the first and third reenactments, be made for the jury's use. The court and defense counsel both agreed with the prosecutor's suggestion:

"THE COURT:   Well, it seems to me what you ought to do is proceed to put them all on separate tapes from your copies, and then perhaps you and defense counsel can agree this is the same thing as what has already been received in evidence.

"[DEFENSE COUNSEL]:   I think that's the proper solution, Your Honor. I would be very reluctant to have them back in the jury room looking at the first reenactment by [defendant] and then have to go through the [second] reenactment by Mr. Jones, and then see the [third] reenactment. They might want to see what Mr. Jones said.

"THE COURT:   I wouldn't do that under any circumstances."

During deliberations, the presiding juror requested that the jury be given a television, a VCR, and the videotape of the reenactments. We assume that this request was respected. The record, however, does not affirmatively show whether State's Exhibit 28, containing all three reenactments, or an edited version was given to the jury; that ambiguity forms the basis for defendant's assignment of error. For the reasons explained below, we conclude that the jury did not see the Jones reenactment.

The record shows that the trial court and counsel were aware that only the first and third reenactments had been offered in evidence by the state. The trial judge stated that he would not allow the jury to see the Jones reenactment "under any circumstances." The judge and defense counsel expressly agreed that the proper solution was to make an edited version of State's Exhibit 28 for the jury's use. The record contains two videotapes, one, which is marked "State's Exhibit No. 28," contains all three reenactments, the other, which is marked "State's Exhibit No. 28 (edited version)" and "Jury Copy State's No. 28 Reenactment," contains only the first and third reenactments.

We conclude that the record does not support defendant's suggestion that the jury viewed the reenactment by Jones alone. Accordingly, we find this claim of error unpersuasive.

### Videotape of Victim's Body

■ Defendant contends that the trial court erred in admitting into evidence a videotape showing the victim's body at the scene of the crime and at the hospital apparently being prepared for autopsy. Defendant argues that portions of the videotape were unfairly prejudicial. OEC 403 provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

When the trial court asked whether defendant objected to the exhibit, defense counsel stated:

> "I don't have any objection to the tape as such, Your Honor. I do at some point [sic] will argue against the introduction of any more pictures of the body. It's not cumulative right now. But they have pictures and then the film and then other pictures. But as far as showing this tape right now, I don't have any objection."

The exhibit was then received in evidence.

Before the prosecutor began to show the jury the videotape, defense counsel asked whether it had any "autopsy pictures on it." The prosecutor answered that the videotape showed pictures of the victim's body at the hospital. Defense counsel then told the court:

> "I do have an objection to a part of the film, Your Honor, at the hospital. I think that's unduly prejudicial to the defendant. Apparently it's just before they start the autopsy."

The court overruled counsel's objection, and the videotape was shown to the jury.

■■ When a defendant claims that relevant evidence is unfairly prejudicial and relies on OEC 403, unless the trial judge concludes that the probative value of the evidence is substantially outweighed by its potential for unfair prejudice, the relevant evidence must be admitted. *State v. Pinnell,* 311

Or 98, 112, 806 P2d 110 (1991). Generally, when evidence is relevant to an issue in dispute, we defer to the decision of the trial judge whether or not to admit it. *State v. Walton, supra,* 311 Or at 234. Defendant does not argue that the evidence was not relevant. Nor does he suggest any cogent reason why we should depart from our traditional view that we review the trial judge's ruling for abuse of discretion. *State v. Moen,* 309 Or 45, 70, 786 P2d 111 (1990). We find no abuse of discretion here and, thus, no error.

## B. PENALTY PHASE

### Mitigating Evidence

■ Defendant contends that the trial court erred, during the penalty phase of his trial, in refusing to give his requested instruction on mitigating evidence.

The state concedes, and we agree, that the trial court's penalty phase instructions were inadequate to comply with this court's opinion in *State v. Wagner,* 309 Or 5, 14-20, 786 P2d 93, *cert den* ___ US ___, 111 S Ct 212, 112 L Ed 2d 171 (1990), which was decided after the trial in this case. Therefore, we vacate defendant's death sentence and remand this case to the circuit court for further proceedings consistent with this opinion.

We address one of defendant's other penalty phase assignments of error because the issue may recur on remand.

### Instruction

Defendant first contends that the trial court erred in instructing the jury about the legal definition of life imprisonment. In *State v. Douglas,* 310 Or 438, 450-51, 800 P2d 288 (1990), we stated:

> "In the absence of evidence making it relevant, a trial court should not give an instruction on the possible release of persons sentenced to life in prison in a proceeding under ORS 163.150 (1987)."[11]

Because we have remanded this case for a new penalty phase

---

[11] We did not decide in *State v. Douglas,* 310 Or 438, 451 n 10, 800 P2d 288 (1990), whether, or in what circumstances such an instruction might be appropriate under the new statute, ORS 163.150 (1989), which provides the additional sentencing alternative of life imprisonment without the possibility of release or parole.

proceeding, we need not determine whether the trial court erred in this regard. We note that *Douglas* was decided after the trial in this case, and we write only to alert the trial court and counsel to our holding in *Douglas*.

The balance of defendant's penalty phase assignments of error need not be addressed. Some issues with respect to them doubtless will arise on remand. The exact nature of those issues, however, is sufficiently problematical that we believe the issues are best left to the new penalty proceeding and the record the parties may make in that proceeding.

## CONCLUSION

We have considered each of defendant's guilt and penalty phase assignments of error and every argument made in support thereof. Any assignment or argument not discussed in this opinion either has been considered by this court previously and resolved against defendant, is not well taken, or is unlikely to recur on remand. We find no reversible error based on those assignments of error.

## DECISION

The judgment is affirmed as to defendant's convictions for aggravated murder and robbery in the first degree. The sentence of death is vacated. The case is remanded to the circuit court for further proceedings consistent with this opinion.

**FADELEY, J.,** dissenting and concurring.

### I.

I dissent for the reasons stated in my dissenting opinion in *State v. Moen,* 309 Or 45, 102-04, 786 P2d 111 (1990) (Fadeley, J., dissenting). Following its decision in *Penry v. Lynaugh,* 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989), the United States Supreme Court vacated an Oregon death penalty sentence, because of inadequacy in Oregon's statutes describing the method whereby a jury determines whether life imprisonment or death will be the sentence imposed. *Wagner v. Oregon,* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989).

The statute found inadequate, ORS 163.150 (1987), was proposed by the initiative process and adopted by the

voters in 1984. On vacation of sentence and *Wagner's* remand to Oregon by the United States Supreme Court, the Oregon Supreme Court majority reacted by a decision to save the initiated statute by adding a 100-word amendment. *See State v. Moen, supra,* 309 Or at 102-04 (dissenting opinion), and *State v. Wagner,* 309 Or 5, 20, 786 P2d 93 (1990) (dissenting opinion). After making the statutory amendment, the majority of this court then remanded *Wagner* to the trial court for a new jury trial of the penalty phase to determine whether the new sentence should be life imprisonment or a death sentence. The statute was found to be inadequate but, with the addition of the majority's 100-word amendment, is to be used for the new trial.

I continue to dissent from the decision of the majority to make an after-the-fact addition to the statute that the people did not include when they voted to adopt the statute. I also object to the attendant delay of finality and the added cost which that delay produces. The United States Supreme Court decision vacated the sentence of death but not Wagner's conviction on his plea of guilty to an aggravated murder committed in 1985. He could have been sentenced to a life term immediately and that case would have been closed.[1] Likewise, in the present case, a life sentence should be imposed on the defendant in this court and this case should be closed. Instead, the majority remands for a new penalty-phase jury trial.

## II.

Assuming that the local authorities elect to retry this case on remand, I am mindful of the fact that 12 new jurors who have not previously been exposed to the case will make the life or death decision by the answers they give to questions posed by the statute as amended by the majority. I am also mindful that these jurors will be told at the beginning of the retrial proceedings that defendant has already been convicted of aggravated murder and is, therefore, eligible to be put to death and that they are required to accept that as a given fact.

I disagree with the portion of the majority opinion in this case that relates to the propriety of instructing the jury

---

[1] While this is being written, the public was informed that a life sentence will be imposed on Mr. Wagner, obviating a retrial of the penalty phase in his case. The same result was ultimately reached on remand of *State v. Moen,* 309 Or 45, 786 P2d 111 (1990).

about its life sentence options. The grounds for disagreement are stated in *State v. Douglas,* 310 Or 438, 454, 800 P2d 288 (1990) (specially concurring opinion), and *State v. Simonsen,* 310 Or 412, 418, 798 P2d 241 (1990) (specially concurring opinion). *See also Caldwell v. Mississippi,* 472 US 320, 105 S Ct 2633, 86 L Ed 2d 231 (1985).

I believe that the jury must be told directly both that it has the option to choose a life sentence rather than the death sentence and that the answers that the jury gives to the questions on the verdict form determine whether the sentence is life or death; otherwise, the constitutional requirements of *Penry* and *Caldwell* may not be met. Hiding the ball from the jury as sentencer is not tolerable.

### III.

I concur with the decision of the court that the remaining penalty-phase assignments of error need not be dealt with because it is presently problematical as to how the issues that the remaining assignments raise will be played out on remand. I am not, however, as sure as the majority that closely kindred issues "doubtless will arise on remand." Those issues, as to which neither the present record nor appellate arguments are complete or clear, involve complex issues under OEC 401-404, and 701-703, among other issues.

For instance, I do not believe it is at all likely that evidence will be admitted on remand, over an OEC 403 objection of undue prejudice, without the trial court's performing the "prerequisite" balancing before admission under *State v. Pinnell,* 311 Or 98, 113, 806 P2d 110 (1991). Nor do I believe that a lay witness necessarily will be again permitted to testify as an expert giving an opinion under OEC 703, bearing on character under OEC 404, based upon movies that defendant watched, or upon a comparison of defendant's interests with those of Adolf Hitler and Charles Manson.

Whether the predicates for these sorts of issues will recur on remand, and the exact nature of those issues if they reappear, is sufficiently problematical that the issues are best left to await another day.