Argued and submitted April 9, affirmed December 22, 1993, appellant's petition for
reconsideration filed January 26 allowed by opinion February 23, 1994
See 126 Or App 504, 869 P2d 349 (1994)

# STATE OF OREGON,
*Respondent,*

*v.*

# RANDY CHARLES BOCKORNY,
*Appellant.*

(C90-08-34879, C89-10-35768;
CA A69266 (Control), A69267)
(Cases Consolidated)
866 P2d 1230

Michael E. Swaim argued the cause for appellant. With him on the brief was Michael E. Swaim, P.C.

Robert B. Rocklin, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

De MUNIZ, J.

## De MUNIZ, J.

Defendant and his wife, Debra Bockorny, were convicted in separate trials of the homicide of Deborah Spicer. We affirmed Debra's convictions. *State v. Bockorny*, 124 Or App 585, 863 P2d 1296 (1993). Defendant appeals his convictions for aggravated felony murder (first degree sodomy), aggravated felony murder (first degree sexual abuse), aggravated murder/concealment (first degree sodomy), aggravated murder/concealment (first degree sexual abuse), aggravated murder/concealment (attempted first-degree sexual abuse), intentional murder and felony murder. ORS 163.095; ORS 163.115. The jury rejected the state's request for the death penalty. The court sentenced defendant to life in prison with concurrent 30-year mandatory minimum terms on the aggravated murder counts and a 20-year mandatory minimum term on the felony murder count.[1] We affirm.

Defendant and his wife met Spicer in a bar after a day of heavy drinking.[2] Debra is bisexual. The three eventually ended up at the Bockorny residence, where Spicer was murdered. Defendant and Debra took Spicer's body and threw it over a cliff into the Clackamas River.

Defendant testified, admitting that he assisted Debra in disposing of Spicer's body, but denying that he had anything to do with the murder. His testimony was that, when the three arrived at the residence, Debra initiated an act of oral sex with him in the presence of Spicer. Defendant ejaculated. Debra and Spicer began engaging in sexual activities in the bedroom. Defendant went into another room, lay down on the bed and passed out. He testified that he was suddenly awakened by a noise, went back into the bedroom and saw Debra on top of Spicer. When Debra got off, defendant testified that he saw that Spicer had been stabbed, and Debra told him that Spicer was dead.

Spicer died as a result of stab wounds to the chest and abdomen and asphyxiation by manual strangulation. Her face was badly bruised and both eyes were blackened. She was

---

[1] Defendant raises no merger claims in this appeal, and we express no opinion about the correctness of the sentences imposed.

[2] Debra's version of the events differs from defendant's. *See State v. Bockorny, supra.*

naked and her body had bruises consistent with her having been held down. There were no defensive wounds. Two sperm heads were identified in material recovered from Spicer's mouth. The state's theory was that defendant and Debra took Spicer to their house where defendant had oral sex with Spicer. Thereafter, defendant and Debra stabbed and choked Spicer to death.

Defendant's first assignment of error is that the trial court erred in denying his demurrer to the indictments and in denying his motion for judgments of acquittal on the ground that the indictments failed to inform him of the nature of the crimes with which he was charged. He argues that, although the indictments allege the elements of homicide, they fail to allege the specific elements of the underlying crimes of sodomy in the first degree and sexual abuse in the first degree that elevate the homicide to aggravated murder.

Defendant was first indicted jointly with Debra in 1989. In 1990, he was individually indicted in a second five-count indictment. He went to trial on two counts in the 1989 indictment, as well as the five counts alleged in the 1990 indictment.[3] He demurred to the 1989 indictment, but did not demur to the 1990 indictment. His first attempt to challenge the sufficiency of the charges alleged in the 1990 indictment was by the motions for judgment of acquittal after the state's case-in-chief.

■ The proper time for an objection to the indictment is before trial. *State v. Montez*, 309 Or 564, 597, 789 P2d 1352 (1990). The state argues that defendant failed to preserve any objection to the charges in the 1990 indictment, because his demurrer was not made at arraignment. *See State v. McKenzie*, 307 Or 554, 558, 771 P2d 264 (1989). However, even assuming that defendant's objections to the 1989 indictment preserved a challenge to the charges in the 1990 indictment, the court did not err in denying the motions.

---

[3] The 1989 indictment alleged aggravated felony murder (attempted first-degree sexual abuse) and aggravated murder/concealment (attempted first-degree sexual abuse). The 1990 indictment alleged aggravated felony murder (first-degree sodomy); aggravated felony murder (first degree sexual abuse); aggravated murder/concealment (first-degree sodomy); aggravated murder/concealment (first-degree sexual abuse); and intentional murder.

■ The Supreme Court recently rejected a challenge to an indictment for aggravated murder on the ground that it was indefinite and uncertain because it did not specify the state's theory or the elements of sexual abuse. *State v. Rogers*, 313 Or 356, 380, 836 P2d 1308 (1992), *cert den* ___ US ___, 122 L Ed 2d 789 (1993). An aggravated murder indictment does not necessarily need to allege all of the elements of the underlying crimes nor the manner in which those crimes were committed. *State v. Montez, supra*, 309 Or at 597. An indictment in the language of the statute generally is sufficient. *State v. Nussbaum*, 261 Or 87, 91, 491 P2d 1013 (1972). The counts here were phrased in the statutory language and sufficiently apprised defendant of the charges against him to enable him to make his defense. *State v. Cohen*, 289 Or 525, 529, 614 P2d 1156 (1980).

■ Defendant next argues that the court erred in denying four of his motions for judgments of acquittal on the ground that there was insufficient evidence from which the jury could find him guilty. He contends that the evidence did not show that he was personally involved in causing Spicer's death, that there was no evidence that any sexual act occurred with forcible compulsion or without Spicer's consent and that there was insufficient evidence to indicate that any sexual crime — as opposed to sexual act — had occurred at all.

The only evidence supporting defendant's version of the events was his testimony. The jury was not bound to accept his version of the facts. *See State v. Rose*, 311 Or 274, 284, 810 P2d 839 (1991). The state presented evidence that defendant, a violent, intoxicated man, took Spicer to his house, had sex with her, that she was attacked and that she died as a result of stabbing and strangulation. It presented evidence that defendant disposed of Spicer's body, concealed evidence of the crime and fled the state. Viewing the evidence in the light most favorable to the state, there was sufficient evidence from which the jury could conclude, beyond a reasonable doubt, that defendant subjected Spicer to sexual contact or deviate sexual intercourse through forcible compulsion and that he personally murdered her.

Defendant next argues that the court erred in allowing the state to call one of his expert witnesses to provide testimony on behalf of the state when the testimony exceeded

the scope of the expert's testimony on defendant's direct examination. During the state's case-in-chief, state criminalist Scarpone testified that, using the "Christmas tree stain" method on material taken from Spicer's mouth, she had identified two sperm heads. During defendant's case, one of his experts, Dr. Brady, testified that, in his opinion, the objects found in the victim's mouth were not sperm heads. Another expert, Dr. Grimsbo, also testified during defendant's case. His testimony was limited to whether material on scissors found in defendant's van was blood.

Before Grimsbo testified, the prosecutor had contacted him to discuss the question of the blood on the scissors. During their discussion, the prosecutor also asked Grimsbo some questions regarding the stain method used to detect the presence of sperm in Spicer's mouth. Grimsbo later contacted the prosecutor to see if he could examine the slides, and the prosecutor complied. On cross-examination, the prosecutor asked the court for permission to examine Grimsbo on a matter beyond the scope of his direct examination, that is, his expertise in the use of biological stains. The court sustained defendant's objection to the state putting on rebuttal at that time. Grimsbo was excused, "subject to recall."

After Grimsbo's testimony, the prosecutor stated that, in order to rebut Brady's testimony, he wanted to call Grimsbo to testify that he had looked at the slides. The court then examined Grimsbo out of the presence of the jury. Grimsbo testified that he had discussed the issue of longevity of sperm with the defense team and later had received a phone call from defense counsel stating that the defense would question him only about the blood on the scissors. He told the court that, pursuant to the trial court's order, defense counsel also informed him that the defense could not tell him not to talk to the prosecution. Grimsbo also told the court that his discussions with the prosecutors did not relate to the testimony he gave for the defense and that he was not asked about conversations with the defense. In an offer of proof, the state then elicited testimony from Grimsbo that the Christmas tree stain method was accurate and that, in his opinion, sperm heads were correctly identified in the material recovered from Spicer's mouth. The court asked him whether he had ever discussed the matter of the stain method and the

identification of the sperm heads with the defense. Grimsbo stated that he had not. Defense counsel then moved to exclude Grimsbo from testifying in the state's rebuttal case on the ground that his testimony was "work product."

An *in camera* proceeding followed. There, defense counsel testified that Grimsbo had told the defense team that, "if he were asked, he would express an opinion that those two objects in the slide were in fact sperm heads * * *." However, defense counsel's testimony did not contradict Grimsbo's claim that he had not discussed the accuracy of the Christmas tree stain method with the defense team. The prosecutor then told the court that Grimsbo would not be asked his opinion about the sperm heads, but would be examined only about the accuracy of the Christmas tree stain method.

The court allowed the state to call Grimsbo in rebuttal, and he testified about stain methods and slide preparation, use of the Christmas tree stain in identifying spermatozoa, his experience with that stain method and the identification of sperm heads not connected to their tails. He did not give an opinion as to whether the material found in Spicer's mouth contained sperm heads. Defense counsel then cross-examined Grimsbo, attacking his credentials and the basis for his opinion that the Christmas tree stain *is* an effective scientific method. During closing argument, the prosecutor argued that defendant's "own expert, Dr. Grimsbo, told you that that test is a valid test for sperm with a sperm tail or without. He testified to that."

Under ORCP 36B(3),[4] a lawyer may avoid discovery of records of interviews, statements, memoranda, correspondence, briefs, mental impressions and other similar data

---

[4] ORCP 36B(3) provides, in part:

"Subject to the provisions of Rule 44, a party may obtain discovery of documents and tangible things otherwise discoverable under subsection B(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of such party's case and *is* unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

prepared by the lawyer to further the client's interest in pending litigation. Defendant's position is that, although the immunity from discovery under that provision is not absolute, there is no rational basis for giving protection to the written opinions and impressions of the expert while disallowing protection for opinions and impressions of the expert that have not been reduced to writing. He argues that allowing the prosecution to elicit impressions of a defendant's expert witness on subjects that were not elicited or relied on by defendant permits the prosecution to question the expert in such a manner that it appears that the expert is joining the ranks of the prosecution.

The state contends that no law is violated when the prosecution calls an expert, who has been hired by a defendant to testify regarding one subject, to testify regarding an unrelated subject. It argues that Grimsbo's testimony on rebuttal regarding the Christmas tree stain method did not violate any discovery statute or privilege.

■ There was no evidence that biological staining was a subject for which the defense retained Grimsbo or that it had been a subject of discussion between Grimsbo and the defense. Therefore, Grimsbo's testimony was not privileged under the attorney-client privilege, nor could it be called work product.[5] Defendant argues, however, that allowing or requiring an expert witness to testify as to matters that are not part of the defendant's case-in-chief creates a conflict of interest. He argues that it creates a situation in which the prosecution can go to defendant's expert and ask that expert also to work for it.

■ There is no dispute that, if an expert is willing to give opinions to both sides, a litigant can be placed in a difficult, if not impossible, situation at trial. However, it is not a situation prohibited by law. Here, the prosecution's questions about the Christmas tree stain method were questions asked of an expert witness about a subject within the expertise of the witness. The prosecution was free to inquire as to whether Grimsbo had an opinion about a subject within his

---

[5] OEC 503(2)(b) provides that a client has a privilege to prevent another person from disclosing confidential communications between the client's lawyer and the lawyer's representative. Here, no communication was disclosed.

expertise. It could have done so even if Grimsbo had not chosen to discuss the subject with the prosecution before he testified. However, in that instance, the prosecution would have run the risk that Grimsbo's testimony would be damaging to its case. Here, that risk was eliminated when Grimsbo voluntarily gave an opinion to the prosecution, thereby alerting the prosecution to a weakness in defendant's case.

■ Defendant next argues that the trial court abused its discretion when it excluded evidence of prior bad acts committed by Debra. Defendant sought to admit evidence that Debra carried a knife that she threatened to use on anyone who came between her and defendant, that she slapped another woman and attacked her with a knife, that she shot a former husband and that she hit a former husband on the head with a hammer.[6] The basis of defendant's offer for the admission of the evidence was that they were "signature-type identity-type of acts." OEC 404(3).[7]

The attacks on former husbands were not similar to the method of Spicer's death; the similarity in the attack on the woman to Spicer's death was the use of a knife. We find no abuse of discretion in the court's determination that the excluded evidence did not demonstrate a high degree of similarity and a distinctive nature of the methodology of prior and current misdeeds. *See State v. Johnson*, 313 Or 189, 197, 832 P2d 443 (1992).

Defendant argues, however, that Debra's prior violent acts were highly probative of his defense that it was she who committed the murder. He contends that the rationale for excluding evidence of prior bad acts — that a defendant will be tried on the basis of his or her propensities or that a victim

---

[6] The trial court admitted evidence that Debra had stated that "she would kill any woman that got in the way between her and her husband and that she would not hesitate to use her knife to do so" and that she had told a woman that "she would cut her from her cunt to her throat if she didn't stay away from her husband." The court excluded the evidence about her former husbands and her assault with a knife.

[7] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

got what he or she deserved—does not apply if the evidence is of prior bad acts of a third party to the litigation.

■     Character evidence, whether of a party or non-party, carries a risk of diverting the jury's attention from what a person did on a specific occasion to what that person has done in the past. *See* Kirkpatrick, *Oregon Evidence* 139 (2d ed 1989). The legislature has not chosen to apply the exclusion of character evidence to only defendants or victims. Under OEC 404(4), it applies generally to "persons."

■     Defendant next contends that the court abused its discretion in failing to define the term "personally" in the context of aggravated murder. The jury gave the court a written question: "Does personally mean solely, or could it be cooperative?" After discussion with counsel, during which defense counsel stated that he thought the jury should be instructed that personally means "solely," the court stated to the jury:

> "I instruct you that the word 'personally' is a word of common usage that should be given its natural, plain, and obvious meaning."

There was no error. The court's instruction was based on *State v. Nefstad*, 309 Or 523, 539, 789 P2d 1326 (1990), in which the Supreme Court discussed a similar argument regarding the word "personally":

> "Defendant argues that 'personally' is a word of 'common usage' that should be given its 'natural, plain and obvious meaning.' The state agrees. The logical consequence of this conclusion is that no instruction is required to tell the jurors what 'personally' means.
>
> "* * * * *
>
> " 'Personally' also is a word that was understandable to the jurors without elaboration by the trial court in the instructions. This does not mean that the words always will be easy to apply to a given set of facts, but the difficulty lies in the application and not in the definition of the word."

Defendant next assigns error to the court's requirement that he display to the jury the multiple tattoos on his arms and chest. He argues that the tattoos had no relevance to identity when, from the beginning of the trial, it was conceded that he was with Debra and Spicer until the time of

the murder. Defendant's position apparently is that the nature of the tattoos was prejudicial, although he does not specify why that is so.

■ The state argues that defendant's unusual tattoos were a key to his identity for several witnesses, particularly given that his appearance had changed substantially between the time of the murder and the time of trial, and that it was required to prove defendant's identity. It contends that it was not required to accept defendant's offered stipulation that he was in the company of the victim, *see State v. Leland,* 190 Or 598, 630, 227 P2d 785 (1951), *aff'd sub nom Leland v. Oregon,* 343 US 790, 72 S Ct 1002, 96 L Ed 1302 (1952), and that the trial court carefully weighed the probative value against any prejudicial effect before concluding that the evidence should be admitted.

Witnesses remembered defendant, in part because of his distinctive tattoos. The trial court viewed the tattoos before requiring them to be shown to the jury and found no "visual prejudicial impact." We find no abuse of discretion in the court's requirement that defendant show them.

Defendant next assigns error to the court's instructions on "aiding and abetting." He argues that the instructions permitted the jury to convict him if they believed that he aided or abetted Debra in committing a sex crime and that there was no evidence that he did so. He also contends that the court abused its discretion in listing forcible compulsion as an element of the underlying sex crimes.[8] He argues that

---

[8] For example, the court instructed the jury:

"We move to Count 1 of the 1989 Indictment. For Aggravated Murder, which alleges that said Defendant on or about October 7th, 1989, in the County of Multnomah, State of Oregon, did unlawfully and intentionally commit the crime of Sodomy in the First Degree. And in the course of and the furtherance of said crime, which the said Defendant was committing, the said Defendant personally and intentionally caused the death of another human being, to-wit: [the victim], not a participant in the crime. To establish this count of Aggravated Murder, the State must prove beyond a reasonable doubt each of the following elements: Number one, that the Defendant * * * committed the crime of Sodomy in the First Degree in that the Defendant or a person he aided or abetted intentionally had deviate sexual intercourse with [the victim] and that [the victim] was subjected to forcible compulsion. Two, that in the course of and in the furtherance of the crime of Sodomy in the First Degree, which the Defendant was committing, the Defendant personally and intentionally caused the death of [the victim], who is not a participant in the crime."

there was no evidence that the force that was apparent in the case accomplished the sexual act, or was in any way related to it.

There was no error in the instructions. There was evidence from which the jury could have concluded that Debra sodomized and sexually abused the victim, that defendant aided and abetted her in doing so and that forcible compulsion was used. *See State v. Williams*, 313 Or 19, 26, 828 P2d 1006, *cert den* ___ US ___, 121 L Ed 2d 118 (1992).

Defendant's final assignment of error is that the court erred when it instructed the jury that felony murder was a lesser included offense in the several charges of aggravated murder. He contends that the state did not allege felony murder in the indictments and that it was never a subject of the state's discovery or in the state's opening argument. There was no error. The elements of aggravated murder, with which defendant was charged, include the elements of felony murder. ORS 136.465 provides:

> "In all cases, the defendant may be found guilty of any crime the commission of which is necessarily included in that with which the defendant is charged in the accusatory instrument or of an attempt to commit such crime."

Defendant presents no authority for his position that a lesser included offense must be pleaded separately in the indictment or that the state must provide notice of a lesser included offense by discovery or during opening argument. A party is entitled to a lesser included offense instruction if a juror could conclude that, based on the evidence, the defendant was not guilty of the greater offense but was guilty of the lesser offense. *State v. Naylor*, 291 Or 191, 195 n 2, 629 P2d 1308 (1981). The court did not err in its instructions here.

Affirmed.