Argued and submitted September 20, 2013, judgment of conviction and sentence of death affirmed April 17, 2014

## STATE OF OREGON,
*Respondent,*

*v.*

## RICARDO SERRANO,
*Appellant.*

## (CC C063227CR; SC S058390)

324 P3d 1274

Meredith Allen, Senior Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem.

Susan G. Howe, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Timothy A. Sylwester and Andrew M. Lavin, Assistant Attorneys General, Salem.

BREWER, J.

## BREWER, J.

This case is before this court on automatic and direct review of defendant's judgment of conviction and sentence of death for multiple counts of aggravated murder. ORS 163.095; ORS 138.012. For the reasons set out below, we affirm the judgment of conviction and sentence of death.

## I. FACTS

Because the jury found defendant guilty, we set out the facts in the light most favorable to the state. *State v. Longo*, 341 Or 580, 582, 148 P3d 892 (2006). Defendant was married to Melinda. After she discovered that defendant was having an affair with another woman, Melinda decided to end their marriage. Around that time, Melinda became romantically involved with a coworker, Nguyen, who lived with Melody Dang and her two sons, Steven and Jimmy. Melody was aware of Nguyen's relationship with Melinda.

During their relationship, Nguyen taught Melinda various phrases in Vietnamese, which Melinda wrote down in a check register. Melinda kept the check register in her vehicle, to which defendant did not have a key. In July 2006, Melinda discovered that she was pregnant. She believed that Nguyen was the father. In September, Melinda left defendant and moved into her sister's apartment. When that living arrangement failed to work out, Melinda moved back in with defendant.

As those events were unfolding, defendant became acquainted with two sisters, Madriz-Mendoza and Miranda-Mendoza. Miranda-Mendoza worked with Melinda and Nguyen, but she did not know that Melinda was married to defendant. Defendant asked Miranda-Mendoza questions about her coworkers, including what they looked like, whether any of the women were pregnant, and whether she knew a curly-haired man named "Mike." On one occasion, as Melinda was leaving work, she stopped to talk with a group of fellow workers—including Nguyen, who was the only person in the group with curly hair. Defendant drove up and angrily told Melinda that she was disrespecting him by talking to the group.

On the evening of November 2, 2006, Melody, Steven, and Jimmy were at Nguyen's house. Nguyen was at work, as was Melinda. Melody and Nguyen had a phone conversation at about 8:30 p.m. Melody sometimes visited Vietnamese-language internet chat-rooms and often had phone conversations with men whom she had met in those chat-rooms. At about 9:00 p.m., Melody called Tran, a Florida resident whom she had met online. As they were talking, Tran heard dogs barking in the background and heard Melody yell, "Oh my God, Oh my God." Then the call was disconnected. When Tran called back, there was no answer; he then sent text messages to Melody, but there was no reply.

The next morning, Nguyen returned home from work. The lights were on, and his dogs were barking. Nguyen entered the house through the garage and saw that the house was messy. Then he saw Melody's body in the hallway. Steven was lying next to her. Their bodies were cold. Nguyen then called 9-1-1. The police arrived within minutes. They observed Melody and Steven lying in the hallway, and they found Jimmy inside a bathroom off the hallway. All three victims had been shot to death.

Three additional noteworthy discoveries were made at the scene. First, when he looked around the living room, Nguyen noticed that a laptop computer was missing. Second, the investigating officers recovered two spent .380 caliber shell casings near the victims' bodies, along with a live .380 caliber cartridge. Third, there was blood on the hallway floor where the victims were found. Using a chemical test, the officers found shoe impressions in the blood.

Melinda returned to defendant's house that same morning after her work shift. Defendant was not home and his vehicle was gone. Later that same day, Melinda saw defendant's vehicle parked down the street. Defendant returned home at 4:00 p.m. He told Melinda that he had not gone to work that day, but he did not appear to be ill.

On November 27, police officers searched defendant's brother's house. The officers found two handguns, one a .380 caliber pistol. They also found several magazines for a .380 caliber pistol, along with boxes of .380-caliber

ammunition. The .380 pistol was later tested by an Oregon State Police firearms examiner. It appeared to have been recently cleaned. The examiner test-fired the pistol and compared the markings on the test bullets to the markings on the bullets recovered from the crime scene. The markings matched. The examiner concluded that the pistol seized from defendant's brother's house had fired the bullets found at the crime scene.

On November 28, police officers executed a search warrant at defendant's residence. Among other items, they found defendant's shoes and, in the back of his vehicle, a partially-full bottle of bleach. The shoes were later tested for blood. None was found, but the shoes appeared to have been recently washed. The officers also found Melinda's check register with the Vietnamese phrases written inside, and they found a key that fit the ignition of Melinda's vehicle. Defendant was arrested the same day. Later, prior to trial, the state compared the shoe impressions found at the crime scene to the tread of defendant's shoes. The impressions matched defendant's right shoe.

Melinda moved out of defendant's house after the search and his arrest. From time to time, she returned to retrieve belongings but, in the meantime, she left the house unlocked. On January 3, 2007, an employee of a property management company cleaned the garage. Underneath a couch, the cleaner found a laptop computer wrapped in a towel inside a garbage bag. When the computer was shown to him, Nguyen recognized that it was similar to the computer that was missing from his living room.

Defendant was indicted on 10 counts of aggravated murder. In counts 1, 2, and 7, which charged defendant with the murder of Melody Dang, the indictment alleged that defendant had murdered her in the course of the same criminal episode that resulted in the death of Steven (count 1); that he had murdered her in the course of the same criminal episode that resulted in the death of Jimmy (count 2); and that he had murdered her in the course of and in furtherance of his commission of first-degree burglary (count 7), ORS 163.095(2)(d); ORS 163.115(1)(b). The counts pertaining to Steven Dang (counts 3, 4, and 8) and Jimmy Dang

(counts 5, 6, 9, and 10) were charged in the same manner, except for count 10, which alleged that defendant had murdered Jimmy, who was a person under the age of 14. ORS 163.095(1)(f). A jury found defendant guilty on all counts. In a separate proceeding, the jury answered the relevant death penalty questions, ORS 163.150, in the affirmative. The trial court merged the convictions into three and sentenced defendant to death.

Defendant now raises 30 assignments of error. We have examined each of those assignments of error, and we reject each one. Eight of the assignments merit discussion, and we now turn to them.

## II. GUILT PHASE

### A. *Motions for Judgments of Acquittal on Felony Aggravated Murder Counts*

As noted, in counts 7, 8, and 9, defendant was convicted of three counts of aggravated felony-murder. ORS 163.095(2)(d); ORS 163.115(1)(b). The indictment alleged as to each of those three counts that the underlying felony was first-degree burglary. A person commits first-degree burglary when he or she "enters or remains unlawfully" in a dwelling "with the intent to commit a crime therein." *See* ORS 164.225; ORS 164.215. The indictment did not specifically identify the underlying crime that defendant intended to commit when he entered the Nguyen/Dang residence. However, the trial court instructed the jury that, to find that defendant had committed first-degree burglary, it must find beyond a reasonable doubt that he had entered the residence with the intent to commit theft therein.

In his third assignment of error, defendant asserts that the trial court erred in denying his motions for judgments of acquittal on the three aggravated felony-murder counts. In support of those motions, defendant had argued to the trial court only that the identified counts required proof that he was "personally involved" in the murders. Before this court, however, defendant does not renew that argument. Instead, defendant asserts that the trial court erred in denying the motions because the state "failed to prove a sufficient causal connection between the homicides and the

burglary-theft" of the laptop computer. In short, by focusing on the causal relationship between the homicides and the burglary based on theft of the computer, defendant's argument on review has a fundamentally different focus from his argument at trial. Because the trial court was never presented with the argument for acquittal that defendant advances on review, defendant's third assignment of error is unpreserved. *See State v. Walker*, 350 Or 540, 548, 258 P3d 1228 (2011) (preservation rule exists, in part, to ensure that the trial court had an opportunity to avoid ruling in error). Defendant concedes as much, but he urges this court to review his third assignment as plain error.

Defendant notes that this court previously has held that, to prove aggravated felony-murder under ORS 163.095(2)(d) and ORS 163.115(1)(b), the state must establish a "causal connection" between the underlying felony and the homicide to show that the homicide occurred "in the course of and in furtherance of" the underlying felony. According to defendant, "a homicide committed before the perpetrator forms an intent to commit a felony can rarely, if ever, be [felony murder]." Instead, defendant argues, ORS 163.115(1)(b) requires a person either to commit—or form the intent to commit—the underlying felony *before* he or she commits the murder. Defendant also argues that, to establish the necessary causal connection, "the deaths must have been a foreseeable risk associated with the commission of the felony."

With respect to the sufficiency of the evidence to satisfy those posited requirements in this case, defendant asserts:

> "[T]he evidence is insufficient to conclude that defendant committed the homicide 'in the course of and in furtherance of' the burglary-theft as charged in this case. The state presented evidence that defendant committed first-degree burglary-theft only after he had caused the Dangs' deaths; therefore, the state failed to prove the required causal connection between the two crimes."

Defendant contends that the state's evidence in this case established, at most, that he had entered Nguyen's residence "with the sole intent to shoot one or more of the three

victims" and, thus, the evidence could not support a "reasonable inference that one of defendant's reasons for causing the victims' deaths was to obtain property, a motivation that if proved, would provide the necessary causal link." Defendant urges that "the evidence support[ed] only a single reasonable inference regarding the timing of events: defendant did not commit the first-degree burglary-theft until *after* he committed the three homicides." (Emphasis in original.)

The state responds that the trial court did not plainly err because none of defendant's unpreserved arguments is obvious or beyond dispute. In the alternative, the state argues that, even if this court were to adopt one of defendant's proposed constructions of ORS 163.115(1)(b), the evidence was sufficient to permit a reasonable juror to find that defendant had formed the intent to steal the laptop before he murdered the Dang family.

Generally speaking, "[n]o matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court." ORAP 5.45(1). The principal exception to the preservation requirement involves "so-called 'plain error'—that is, an error apparent on the record about which there is no reasonable dispute." *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). To qualify as "plain error," an asserted error must be (1) one of "law"; (2) it must be "apparent, *i.e.*, the point must be obvious, not reasonably in dispute"; and (3) "it must appear 'on the face of the record,' *i.e.*, the reviewing court must not need to go outside the record to identify the error or choose between competing inferences, and the facts constituting the error must be irrefutable." *Ailes v. Portland Meadows Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991) (*quoting State v. Brown*, 310 Or 347, 355-56, 800 P2d 259 (1990)). If each of those requirements is satisfied, the court proceeds to the second step, where it must decide whether to "exercise its discretion to consider or not to consider the error[.]" *Ailes*, 312 Or at 382.

With respect to the obviousness requirement, defendant must demonstrate both that (1) the legal principles on which he relies are "obvious" and beyond reasonable dispute and (2), applying those "obvious" legal principles to the evidence in the record, the state's proof was legally insufficient.

*See, e.g., Brown*, 310 Or at 355-56. As we now explain, the legal points on which defendant relies are not obvious or beyond dispute; accordingly, it is not necessary to determine whether the state's proof was sufficient to satisfy them.

For the purposes of its incorporation into ORS 163.095(2)(d) (the aggravated murder statute at issue), ORS 163.115(1)(b) provides, in part:

"(1)   Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"* * * * *

"(b)   When it is committed by a person * * * who commits or attempts to commit any of the following crimes and *in the course of and in furtherance of the crime* the person is committing or attempting to commit, or during the immediate flight therefrom, the person * * * causes the death of a person other than one of the participants:

"* * * * *

"(C)   Burglary in the first degree as defined in ORS 164.225[.]"

(Emphasis added.) To establish that a homicide was committed "in the course of and in furtherance" of the underlying crime, ORS 163.115(1)(b), the state must prove a "causal connection" between that crime and the homicide. *State v. Lopez-Minjarez*, 350 Or 576, 590, 260 P3d 439 (2011); *State v. Rose*, 311 Or 274, 285, 810 P2d 839 (1991).

As noted, defendant asserts that that requirement necessarily means that a defendant must either commit, or form the intent to commit, the underlying crime *before* committing murder. In support of that argument, defendant relies on this court's statement in *Rose* that "[s]omething more than a mere coincidence of time and place * * * is necessary to show that the homicide occurred 'in the course of and in furtherance of' the felony. There must have been some causal relationship between the [felony] and the homicide." *Rose*, 311 Or at 285. However, defendant takes that statement out of context. A more complete quotation follows:

"The relevant question is *not* whether the victim's death preceded, occurred during, or followed the [underlying felony],

but whether the [felony] and the defendant's acts that caused the victim's death are so related in time, place, and circumstances that the trier of fact could find beyond a reasonable doubt that the homicide occurred 'in the course of and in furtherance of' the [felony]. Something more than a mere coincidence of time and place, however, is necessary to show that the homicide occurred 'in the course of and in furtherance of' the felony. There must have been some causal relationship between the [felony] and the homicide."

*Id.* (citations omitted; emphasis added). As the full quotation above demonstrates, this court's decision in *Rose* is inconsistent with defendant's argument that commission of an underlying felony must precede the victim's death. Accordingly, defendant has furnished no basis for us to conclude that the trial court erred in failing to acquit him on that ground, much less for us to conclude that the court obviously erred in failing to do so.

With respect to defendant's alternative argument that, to be guilty of felony murder, a defendant must have formed the intent to commit an underlying felony before committing the murder, the answer is less clear-cut. Although *Rose* confirms that a "causal relationship" between the two crimes is required, this court has never elaborated on the scope and dimensions of that requirement. In *Lopez-Minjarez*, this court described the "in the course and furtherance of" requirement of ORS 163.115(1)(b) as follows:

"The requirement that the homicide be in the course and furtherance of the predicate felony is a familiar concept from the common-law crime of felony murder. As one authority describes it,

"'whether there is a sufficient causal connection between the felony and the homicide depends on whether the defendant's felony dictated his [or a co participant's] conduct which led to the homicide. If it did, and the matters of time and place are not too remote, the homicide may be 'in the commission of' the felony; but if it did not, it may not be.'

"Wayne R. LaFave, 2 *Substantive Criminal Law* § 14.5(f), 466 (2d ed 2003); *see generally State v. Rose*, 311 Or 274, 285, 810 P2d 839 (1991) ('Something more than a mere coincidence of time and place, however, is necessary to show that

the homicide occurred "in the course of and in furtherance of" the felony. There must have been some causal relationship between the robbery and the homicide.')."

350 Or at 589-90.

The issue in *Lopez-Minjarez* was whether the defendant had withdrawn from participation in a predicate felony (kidnapping) that admittedly was initiated before the charged homicide was committed. *Id.* at 590-91. Accordingly, it was not necessary for the court to consider the issue that defendant raises here. Moreover, among courts that have directly considered the issue in interpreting similar statutory language, there is a split of authority as to whether it is necessary that the defendant have intended to commit an underlying felony before committing a homicide. *See* LaFave, 2 *Substantive Criminal Law* § 14.5(f) at 468 n 119 (noting division among courts and collecting cases). It may be, as Professor La Fave suggests, that "[i]t would seem that the homicide, done without thought of a felony, could not be 'in the commission of' the felony." *Id.* at 468. However, this court has never had that issue before it for resolution. Accordingly, defendant has not demonstrated the obviousness of the posited unpreserved error. *See, e.g., State v. Reyes-Camarena*, 330 Or 431, 436, 7 P3d 522 (2000) (legal point on which defendant relied was not "obvious," because "[n]o Oregon appellate court [had] considered the issue, let alone held that [the] defendant's position [was] correct."). We therefore reject that aspect of his plain error argument.

As noted, defendant also asserts that the trial court erred in denying his motion for judgment of acquittal because the victims' deaths were not a "foreseeable result" of his act of burglary. In support of the "foreseeable result" aspect of his argument, defendant relies on Professor LaFave's statement that, "[i]n most jurisdictions even more than a but-for causal relationship is required, the usual rule being that the death must be the foreseeable or natural result of the felony." LaFave, 2 *Substantive Criminal Law* at 465.[1] Again,

---

[1] Defendant does not argue that the state's evidence in this case was insufficient to establish a "but for" causal connection between the homicides and the underlying felony or, for that matter, that that is a pertinent test for determining whether a homicide was committed in the course of and in furtherance of a felony.

defendant concedes that he did not preserve that aspect of his argument. Accordingly, its success depends on his ability to establish that the trial court plainly erred and, if so, that we should exercise our discretion to correct the error.

At oral argument, defendant elaborated on that aspect of his argument, asserting that the "causal connection" requirement meant that the death had to be the "foreseeable, natural result" of the felony and "that the felony leads to the homicide, not the other way around." Apart from arguable implications flowing from the above-quoted statements in *Rose* and *Lopez-Minjarez*, this court has not discussed the "foreseeable result" test for which defendant advocates, nor has this court explored its contours. However, for present purposes, two responses suffice. First, the principal purpose of that construct is to address the dilemma of unintended or coincidental killings committed by the defendant or another person in the course of the commission of a predicate felony. *See LaFave*, 2 *Substantive Criminal Law* at 452-59. Defendant has not explained how it pertains to the evidence in this case, where the state theorized that defendant personally and intentionally killed the victims in the course of the burglary based on theft, and defendant did not theorize that he or anyone else had unintentionally or coincidentally done so. Second, courts that have adopted a "foreseeable result" test have wrestled at length with questions involving the necessary degree of causal relationship in time, place, and circumstance between an underlying felony and the homicide. *See id.* However, this court has not adopted that test in any governing precedent and, even if it had, how those considerations would play out based on the record in this case is not obvious. Accordingly, the trial court did not plainly err in failing *sua sponte* to direct defendant's acquittal based on that ground.

B. *Challenge to the Trial Court's Answers to the Jury's Questions*

Defendant's fourth and fifth assignments of error focus on another aspect of the trial of the three aggravated felony-murder charges on which he was convicted. In those assignments of error, defendant asserts that the trial court erred by instructing the jury, in response to two questions

that it asked during deliberations, that "in furtherance of the crime of burglary means during the effort to commit the burglary."

During its deliberations, the jury posed to the court a series of written questions. The court's answers to two of those questions are at issue here. In the first question, the jury asked:

> "Need clarification. 'In furtherance of the crime of burglary...' We've read this 10 times. Does this imply that the murders 'resulted from the crime of burglary?' Count 7 4(a) and Count 9 4(a)."

(Underscoring in original.) The trial court replied with a written answer:

> "You ask if 'in furtherance of the crime of burglary' in elements 4(a) of counts 7, 8, and 9 requires that the murders 'resulted from the crime of burglary?' In this instance, 'in furtherance of the crime of burglary' means during the effort to commit the burglary."

The record shows that, before answering that question, the court consulted with the parties, and defendant ultimately agreed with the answers that the court gave. As the court explained on the record:

> "[T]hey had a question regarding in furtherance of the crime of burglary and, after some discussion, a bit of a compromise from both sides, both sides agreed on the answer that I gave."

The court then alluded to a second question:

> "And then we have another question pending, but it's almost five o'clock, so I'm going to let them go and I've got a proposed answer to give to you, but I'd rather let them out, let them go and then we can talk if we have to talk."

The court recessed for the day and told the parties:

> "And, counsel, I gave you those answers. As far as I'm concerned we can go into recess, we can go back into chambers and discuss that and let everybody else get on about their business if that's okay with you."

The parties agreed, and the court and counsel then retired to chambers to discuss the jury's second question, which asked:

"Seeking clarification on the definition of the elements: Is the sequence of crimes relevant in aggravated murder—felony murder and felony murder?"

The next morning, the trial court gave the following written answer to that question to the jury:

"You ask if the sequence of crimes is relevant in Aggravated Murder—Felony Murder and Felony Murder.

"I suspect that this concern is related to your last few questions. The answer lies in elements 4(a) and 4(b) of those crimes. 'Sequence' in the sense of which crime started first is not an element of the offenses. However, the causing of death must have occurred during the effort to commit the burglary—4(a)—or during immediate flight from the burglary—4(b)."[2]

After giving that answer, the court recounted on the record the process that had led to its crafting and submission:

"[W]e had a question that came out. I consulted with counsel for both sides on the—on the answer, the answer was agreed upon and you've got your copies of the questions and the answer.

"[The Prosecutor]: And—and, your honor, if—if I might, I'd like to note for the record that there was a question at the end of the day yesterday. The court had a proposal, the parties met in chambers to discuss it and the parties agreed with the ultimate answer that was submitted to the jury this morning on the last question of the day yesterday. Both sides agreed with it.

---

[2] The court had previously instructed the jury that the elements 4(a) and 4(b) of aggravated felony-murder were:

"In this case to establish the crime of aggravated felony murder the state must prove beyond a reasonable doubt the following four elements * * * four, (a) in the course of and in furtherance of the crime of burglary in the first degree which [defendant] was committing, [defendant] personally and intentionally caused the death of [the victim] who is not a participant to the crime; or (b) during the immediate flight from the crime of burglary in the first degree which [defendant] was committing, [defendant] personally and intentionally caused the death of [the victim] who was not a participant in the crime."

The court gave the same instruction with respect to the felony-murder counts involving all three victims. That instruction was based on Uniform Criminal Jury Instruction 1302. Defendant did not object to the giving of that instruction, and he does not assert before this court that it was erroneous.

"[The Court]:  That's—

"[Defense Counsel]:  Correct.

"[The Court]—Correct as well. Thank you for reminding me to put that—get that on the record."

In separate assignments of error, defendant now challenges the trial court's answers to the two questions that the jury asked. In particular, defendant asserts that the use of the word "during" in both answers essentially instructed the jury that it was not required to find a causal connection between the felony and the homicides to convict defendant of the felony murder charges. Instead, defendant argues, the use of that word permitted the jury to convict him based solely on a temporal overlap between the commission of the burglary and the murders. Defendant concedes that he failed to preserve that argument before the trial court. However, defendant asserts that it is obvious that ORS 163.115(1)(b) requires a causal connection between the two crimes; he further reasons that, because the court did not inform the jury that it was required to find such a causal connection, the answers that the court gave were plainly erroneous. At oral argument, defendant's counsel amplified that argument, asserting that, whatever the nature of the causal connection required by ORS 163.115(1)(b), the trial court's answers were plainly erroneous because those answers "completely omitted it."

Defendant also contends that the asserted error requires reversal because the court's answers prejudiced him. Defendant explains:

"Here, if the jury believed that defendant's theft of the laptop was a mere afterthought and therefore not causally connected to the homicides, it still could have found defendant guilty of aggravated felony murder based on the trial court's erroneous instructions because it could have found that defendant committed the homicides during his commission or immediate flight from the burglary-theft. In that way, the trial court's erroneous definition of 'in the furtherance of' could have led the jury to convict defendant on a theory of criminal responsibility that does not exist in the law."

Finally, defendant argues that his conviction on a nonexistent theory of criminal liability violated his rights under the

Due Process Clause of the Fourteenth Amendment to the United States Constitution.

The state's response is multi-layered. First, the state asserts that plain error review of defendant's assignments is barred by ORCP 59 H because defendant failed to except either to the jury instruction on felony murder or to the trial court's answers to the jury's questions. We reject that contention. *See State v. Vanornum*, 354 Or 614, 628-29, 317 P3d 889 (2013) (failure to meet requirements of ORCP 59 H does not bar appellate court plain error review). Second, the state asserts that the trial court's answers accurately stated the governing law. The state relies on this court's decision in *State v. Reyes*, 209 Or 595, 628, 308 P2d 182 (1957), which held that the trial court in that case had properly instructed the jury that the then-extant felony-murder statutory phrase "in the commission of any felony" meant that the killing must be accomplished "at some time during the interval of the beginning and completion" of the predicate felony. Finally, the state asserts that, even if this court is unwilling to endorse the trial court's answers as accurate statements of the law, any error in giving them is not "obvious" and, therefore, not plainly erroneous.

We begin by noting that defendant does not argue that the trial court erred by electing to answer the jury's questions. Rather, defendant challenges the substance of those answers, which were tantamount to supplemental jury instructions. In determining whether it was error to give a particular jury instruction, this court reviews the instructions as a whole to determine whether they accurately state the law. *State v. Barnes*, 329 Or 327, 334, 986 P2d 1160 (1999); *State v. Rogers*, 313 Or 356, 383, 836 P2d 1308 (1992).

The parties debate at length whether the trial court's answers to the jury's questions erroneously stated the governing law and, if so, whether giving them was plainly erroneous. In this case, however, we conclude that it is unnecessary to make those determinations. That is so because defendant, the party seeking review, agreed to the giving of the supplemental instructions that he now challenges.

This court has consistently declined to review plain error—assuming that it exists—in such circumstances. *See State v. Fults*, 343 Or 515, 520-23, 173 P3d 822 (2007) (emphasizing the importance, in deciding whether to correct assumed plain error, of the "defendant's apparent encouragement of the judge's choice"); *see also State ex rel Juv. Dept. v. S. P.*, 346 Or 592, 606, 215 P3d 847 (2009) (stating that "[t]his court has determined that it will not exercise its discretion to review an asserted plain error if the party seeking review encouraged commission of the error in question or made a strategic choice not to object."). Here, defendant made an explicit decision to endorse the court's answers to the jury's questions, and "he may not seek refuge from that deliberate choice on appeal." *Id.* We therefore reject defendant's fourth and fifth assignments of error without further discussion.

C. *Testimony that Physical Evidence had been Released to Defendant*

In his eleventh assignment of error, defendant argues that the trial court erred by permitting a police criminalist to testify, over defendant's objection, that certain physical evidence had been released to defendant for examination.

At trial, the prosecutor called an evidence officer from the Washington County Sheriff's Office, Marsden, to testify about how physical evidence had been catalogued and stored during the course of the investigation. Marsden testified that items of physical evidence were brought to a sheriff's evidence storage facility and each item was then bar coded and recorded on a property receipt. Marsden also described how, generally speaking, when a piece of evidence is released to a defendant for examination, that transaction is documented on a property receipt. During Marsden's description of that process, and following a brief conference with the trial court and the prosecutor out of the jury's presence, defendant objected. Defendant argued:

> "It appears to me that this witness is going to be asked a series of questions about an evidence view that the defense team did. I do not think that's in any way, shape or form relevant to the jury.

"Also, we had at one time, pursuant to the court's order, the shoes that were released to a forensic expert along with the gun and the bullets in question to a forensic expert. No information has been provided to the prosecutor about what those results were, but it's certainly trying to create an inference with this jury that somehow the defense is withholding information from the jury.

"And the reality is the defense has no burden of proof whatsoever in a criminal case like this, yet this argument, this line of questioning is putting that burden on us that somehow we withheld information that we should have been presenting to the jury."

The trial court asked defense counsel how the prosecutor's line of questioning would suggest that inference, and counsel replied:

"Because the jury's going to infer that some result was—came out of that examination and the fact that we didn't present it to the jury would certainly create the inference that the findings from our own expert may have been consistent with the state's findings.

"And again, we have no burden of proving anything in the courtroom. Whether we test something or not, it's solely up to us to decide whether we want to present evidence of that. And I think it's a shifting of the burden to the jury with the inference they can make there was some finding that wasn't given to them, that it's now put some burden on us."

In response, the prosecutor argued that:

"I don't think it does that at all, your honor. [Defense counsel] has made statements kind of obliquely to the jury and made them elsewhere that this evidence is not of any value, that it doesn't tie the defendant to the homicide scene.

"He has attacked with his questioning [another evidence officer]. He's questioned the verification process, required us to bring in the verifier. This is chain of custody. These items were provided to the defense. If there was an issue, I'm sure that they would have been—it would have been brought up with respect to the jury."

The prosecutor went on to assert that, because defendant was likely to argue that the physical evidence in

the case had been somehow tainted, or that someone had framed him for the murders, evidence of how the evidence was handled after it had been seized from defendant was relevant to rebut those potential arguments. Defense counsel replied that he had not made a chain of custody argument and that he did not intend to assert that the police had planted any of the physical evidence in the case.

The trial court overruled defendant's objection, explaining that:

"Well, I think there is some probative value to showing the chain of custody and showing that the defense had the opportunity to examine the items. And I don't think it puts an unfair burden on the defense or raises the inference that the defense has to prove anything."

Marsden proceeded to testify that several pieces of physical evidence, including the shoe impressions made in the Dang residence and ballistics evidence from the handgun found in defendant's brother's home, had been released to the defense for examination. Marsden also testified that the same items had been released to the Oregon State Crime Lab. Defendant did not cross-examine Marsden.

On review, defendant asserts that (1) Marsden's testimony was irrelevant under Oregon Evidence Code (OEC) 401[3] because defendant had not challenged the integrity of the physical evidence against him; and (2) the testimony was unfairly prejudicial under OEC 403[4] because it had suggested to the jury that defendant was required to disclose the results of any tests that he may have performed on the physical evidence that was released to him. The state responds that the evidence was relevant to establish the chain of custody of the physical evidence and that the chain of custody

---

[3] OEC 401 provides:

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[4] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

was relevant because the state's case against defendant was circumstantial, and its probative weight depended on the strength of physical evidence linking defendant to the crime scene. The state further argues that Marsden's testimony was not unfairly prejudicial because it was unlikely that the jury would have drawn the layered set of inferences that defendant posits.

Whether evidence is relevant under OEC 401 is question of law. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999). OEC 401 establishes a "low threshold" for the admission of evidence. *Id.* (quoting *State v. Hampton*, 317 Or 251, 255 n 8, 855 P2d 621 (1993)). Where evidence is offered to support an inference, the evidence is relevant "so long as the inference desired by the proponent is reasonable, even if the evidence also could support a contradictory inference." *Titus*, 328 Or 475. Defendant's relevance argument is grounded in the premise that, because he had not challenged the integrity of the physical evidence before Marsden testified, her testimony was irrelevant.

Defendant's argument misses the mark. As this court recognized in *State v. Zybach*, 308 Or 96, 775 P2d 318 (1989), a party bearing the burden of proof is entitled to anticipate, as part of its case-in-chief, inherent weaknesses that might make its case less believable. In *Zybach*, the state offered evidence of certain encounters between the defendant and the victim to explain why the victim had delayed reporting that the defendant had raped her. *Id.* at 100. The trial court admitted the evidence over the defendant's objection, and, following his conviction, the defendant appealed. The Court of Appeals reversed, holding that testimony regarding the victim's delayed reporting was not admissible unless the defendant had first raised that issue. *State v. Zybach*, 93 Or App 218, 222, 761 P2d 1334 (1988). On review, this court concluded that the challenged evidence was properly admitted. This court observed that to characterize the evidence as "rehabilitative" was to "miscast" it; rather, the evidence was relevant "to show why the child had not reported the original sexual assault," and it was "admissible in the state's case-in-chief under [the state's] obligation to prove the charge beyond a reasonable doubt." *Zybach*, 308 Or at 100.

The situation in this case is analogous. The state's case against defendant was circumstantial, and the physical evidence linking defendant to the crime scene—including the shoe impressions and ballistics evidence—was crucial. The state was entitled to adduce testimony establishing the chain of custody of that physical evidence; it was not required to wait for defendant to lead with a challenge to its probative weight. Marsden's testimony tended to make the probative weight of the physical evidence greater than it would have been without her testimony, because it showed how the evidence was maintained while in the state's custody and that the only break in the state's custody occurred when the evidence was in the hands of the defense and the state was not responsible for its condition and security. That is all OEC 401 requires. The evidence was relevant.

We turn to whether the trial court abused its discretion by admitting Marsden's testimony over defendant's objection that it was unfairly prejudicial under OEC 403. We review a trial court's decision to admit evidence over such an objection for abuse of discretion. *State v. Brumwell*, 350 Or 93, 107, 249 P3d 965 (2011). As noted, defendant argues that Marsden's testimony suggested to the jury that defendant was bound to disclose the results of any tests performed on the evidence released to him. According to defendant, that suggestion likely led the jury to hold against him his failure to introduce the results of such tests. It follows, defendant reasons, that the jury probably assumed that he had failed to meet a burden of proof and then concluded that it could convict him on that ground. We disagree.

The jury was instructed that the state had the burden of proof, and this court presumes that a jury followed trial court instructions in the absence of a showing that it is unlikely that they were able to do so. *See, e.g., State v. Smith*, 310 Or 1, 26, 791 P2d 836 (1990). Nothing in the record suggests that the jury in this case was unable to follow the court's instructions. Based on those instructions, it is improbable that the jury drew the chain of inferences that defendant posits from Marsden's testimony regarding how evidence was logged in and out of the evidence storage facility and the fact that the shoe impressions and ballistics

evidence had been released to defense counsel. Because the probative value of the challenged evidence was not outweighed by unfair prejudice to defendant, the trial court did not abuse its discretion in admitting it over defendant's objection under OEC 403.

## D. Limitation of Defense Counsel's Closing Argument

In his seventeenth assignment of error, defendant argues that, by instructing the jury to disregard a statement that his counsel made during closing argument, the trial court abridged his right to counsel under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution.[5]

During closing argument, defense counsel argued:

"Let's talk about the motive here. Okay? This is where the state's circumstantial evidence case comes up short. How much has the state proved to you that my client knew? Okay. How much did [defendant] know about the affair? Did he know about the sexual activity between [Melinda and Nguyen]? Did you hear one piece of evidence that he even knew about the pregnancy or the fact that he wasn't the father?"

At that point, the prosecutor objected. The trial court held a sidebar conference with the parties and then instructed the jury to "disregard [defense counsel's] last comments and he's going to rephrase them." Defense counsel then told the jury that:

"What, I guess, I'm going to ask you to do, and I'll shorten this, is what evidence has the state shown you about the knowledge that my client had about the circumstances that were going on?"

After the jury retired to deliberate, the trial court engaged counsel regarding the prosecutor's objection. Defendant explained:

---

[5] Article I, section 11, of the Oregon Constitution provides, as pertinent here: "In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel[.]"

The Sixth Amendment to the United States Constitution provides, as pertinent here: "In all criminal prosecutions, the accused shall enjoy the right * * * to have the assistance of counsel for his defence."

"Essentially, what I was—the argument I'm making here is a key component of the state's case has been the motive behind this alleged crime. The court's ruling I feel has handicapped us to kind of not be able to respond to that. I was not intending to make the argument that the state withheld this information, but I was intending to incorporate it into the overall lack of proof and how it hasn't met the standard of proof beyond a reasonable doubt and, essentially, that the jury hadn't been given—given any information as to the level of knowledge that my client possessed in order for that motive to exist."

The trial court then explained why it had sustained the prosecutor's objection:

"I did sustain the objection and on the theory that—on that particular event there was evidence, I believe, suppressed. I think it was out of the telephone records the issue that went to the Supreme Court in this case.[6]

"I sustained the objection on the theory that the defense can't use that as both a sword and a shield. That to argue that the state didn't produce any evidence that the defendant had knowledge of the pregnancy, because we do know that evidence was out there, it's just that the state couldn't use it.

"I didn't intend to and I don't think I did say you couldn't argue lack of evidence, in general, as to his knowledge or lack of evidence that he had motive to do it, but as to that to pick pieces of evidence that [the prosecutor] objected to, that's why I sustained the objection."

On review, defendant argues that the trial court impermissibly curtailed his closing argument by preventing him from arguing his theory of the case. The regulation of jury argument is, generally speaking, committed to the discretion of the trial court. *State v. Rogers*, 330 Or 282, 300, 4 P3d 1261 (2000). Jury argument properly may include references to matters that are within the bounds of the issues

---

[6] Before trial, defendant moved to suppress under the marital-communications privilege, OEC 505, evidence that Melinda had told defendant of her affair with Nguyen, and had also told defendant that Nguyen was the father of the child. The trial court suppressed the evidence, and this court affirmed. *State v. Serrano*, 346 Or 311, 210 P3d 892 (2009).

and evidence in the case. *See State v. Simonsen*, 329 Or 288, 298, 986 P2d 566 (1999), *cert den*, 528 US 1090 (2000) (where the challenged statements in the state's closing argument contained information that the state had introduced as evidence, the defendant "failed to demonstrate how those statements, which referred to evidence already before the jury, resulted in prejudice").

Assuming, without deciding, that the trial court erred by instructing the jury to disregard defense counsel's statement, we conclude that the error was harmless because counsel made substantially the same argument to the jury immediately after the court's intervention. As noted, after the court ordered the jury to disregard defense counsel's statement, counsel argued:

> "What, I guess, I'm going to ask you to do, and I'll shorten this, is what evidence has the state shown you about the knowledge that my client had about the circumstances that were going on?"

That argument—to which the state did not object—conveyed the same essential point as the argument that the trial court had excluded: That the state had failed to prove that defendant knew about "the circumstances that were going on," that is, Melinda's relationship with Nguyen. Defense counsel's subsequent statement was not as specific as the stricken statement, but it nonetheless communicated to the jury defendant's position that the state had failed to prove that he had a motive to murder the victims. Because there was little likelihood that the trial court's action—even if erroneous—affected the jury's verdict, we reject defendant's seventeenth assignment of error. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (setting out standard).

## III.  SENTENCING

We turn to defendant's assignments of error concerning the sentence of death that the trial court imposed based on the jury's sentencing verdict. Three of defendant's assignments of error concerning evidence adduced at the sentencing hearing merit discussion.

Sentencing hearings after a conviction for aggravated murder are governed by ORS 163.150.[7] As pertinent here, the jury was instructed that it must answer three questions: First, whether defendant's conduct "that caused the death[s] of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result," ORS 163.150(1)(b)(A); second, whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," ORS 163.150(1)(b)(B); and, finally, "whether [defendant] should receive a death sentence," ORS 163.150(1)(b)(C).

_____

[7] ORS 163.150 provides, in part:

"(1)(a) Upon a finding that the defendant is guilty of aggravated murder, the court, except as otherwise provided in subsection (3) of this section, shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment, as described in ORS 163.105(1)(c), life imprisonment without the possibility of release or parole, as described in ORS 163.105(1)(b), or death. The proceeding shall be conducted in the trial court before the trial jury as soon as practicable. *** In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence including, but not limited to, victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family and any aggravating or mitigating evidence relevant to the issue in paragraph (b)(D) of this subsection; however, neither the state nor the defendant shall be allowed to introduce repetitive evidence that has previously been offered and received during the trial on the issue of guilt. The court shall instruct the jury that all evidence previously offered and received may be considered for purposes of the sentencing hearing. This paragraph shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Oregon. The state and the defendant or the counsel of the defendant shall be permitted to present arguments for or against a sentence of death and for or against a sentence of life imprisonment with or without the possibility of release or parole.

"(b) Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

## A. *Testimony Regarding Hispanic Prison Gangs*

In his nineteenth and twentieth assignments of error, defendant argues that the trial court erred by failing *sua sponte* to declare a mistrial (or by failing *sua sponte* to strike the testimony and give a curative instruction) after an Oregon Department of Corrections (DOC) officer testified about Hispanic prison gangs within Oregon's prisons. Defendant did not object to that testimony, but he argues on review that it impermissibly injected the issue of race into the trial and prejudiced him by making the jury more likely to sentence him to death. Defendant relies on decisions holding that the Due Process Clause of the Fourteenth Amendment prohibits racially biased prosecutorial arguments. *See generally, e.g., Donnelly v. DeChristoforo*, 416 US 637, 643, 645, 94 S Ct 1868, 40 L Ed 2d 431 (1974); *Simonsen*, 329 Or at 300 (this court will reverse when "the effect of the prosecutor's [actions] is to deny a defendant a fair trial"). In such circumstances, this court reviews a trial court's determination whether to grant a mistrial based on prosecutorial misconduct for abuse of discretion. *Id.* For the reasons set out below, we reject defendant's arguments.

At the beginning of the sentencing hearing, the prosecutor called Wagner, a DOC lieutenant, to testify "about what prison life is like with respect to the facility and how inmates are housed. How they're housed if they are sentenced to death. How they are housed if they receive a life sentence." Wagner described the physical layout of the Oregon State Penitentiary as well as the level of segregation and control imposed on prisoners housed on death row compared to prisoners sentenced to life imprisonment, who are typically housed with the general prison population. The prosecutor then engaged Wagner in the following colloquy:

[Prosecutor]: "Lieutenant Wagner, I have a couple of questions for you. Are there gangs—and I'll use the term gangs—that operate within the Department of Corrections?

[Wagner]: "Yes, there are.

[Prosecutor]: "Are there three general categories that you break those down into?

[Wagner]: "I would break them down into gangs, mostly went from white Hispanic and Black.

[Prosecutor]: "Are they generally divided among race?

[Wagner]: "Generally, yes.

[Prosecutor]: "With respect to Hispanic gangs, are there more than one that operate within the facility?

[Wagner]: "There is one major one and then there's subsets that operate within the facility.

[Prosecutor]: "Okay. And I—I take it the Department of Corrections does whatever it can to curtail gang activity within the facility?

[Wagner]: "Correct.

[Prosecutor]: "And it still goes on?

[Wagner]: "Yes, it does. Unfortunately.

[Prosecutor]: "Okay. Is there a hierarchy within the Hispanic gangs within the facility?

[Wagner]: "Yes, there are. *There's ones that are called soldiers and then there's your shock collars.*

[Prosecutor]: "Do these gangs consist of individuals who were gang members when they entered the facility and individuals who become gang members after they enter the facility?

[Wagner]: Both."

(Emphasis added.)

Wagner then described how gangs within DOC institutions typically approach new inmates and tell them either to join the gang or pay the gang for protection from harm. Whether or not an inmate is offered membership in the gang depends on the inmate's crime of conviction, Wagner testified, with murder giving an inmate "very high" status. According to Wagner, gangs within DOC institutions are financially driven, working to generate income by "introducing contraband, mostly drugs" into the prisons. During cross-examination, Wagner testified that the "general ages" of gang members were "eighteen to probably twenty-five, twenty-seven."

Defendant argues that Wagner's description of the hierarchy within Hispanic gangs as "ones that are called soldiers and then there's your shock collars," should have led the trial court, *sua sponte*, to grant a mistrial, or to strike the testimony and instruct the jury to disregard it. Defendant acknowledges that he failed to preserve those arguments, but urges this court to review them as plain error. According to defendant, Wagner's testimony "isolated 'Hispanic gangs' from other gangs in a way that made the 'Hispanic' gangs seem more dangerous than the others," because

> "Lieutenant Wagner's answer that 'Hispanic gangs' have roles such as 'soldiers' and 'shock collars' was incredibly inflammatory. Soldiers are trained in warfare, and a 'shock collar' commonly refers to a dog-training collar that delivers electric shocks. * * * Both words have violent and frightening connotations. The testimony violated due process because it applied those violent and frightening words to 'Hispanics,' which is defendant's ethnicity."

Defendant further asserts that the testimony prejudiced him because, viewed in light of Wagner's testimony about how new inmates are recruited into gangs, "the testimony that Hispanic gangs have soldiers and shock collars suggested that Hispanic inmates, a group that defendant would soon join, are encouraged if not irresistibly predisposed to violence upon entering prison." It follows, defendant reasons, that he was entitled to a mistrial or to an instruction directing the jury to disregard that testimony. According to defendant, the trial court's failure to take either course of action prejudiced him, particularly with regard to the jury's determination, under ORS 163.150(1)(b)(B), whether he would "commit criminal acts of violence that would constitute a continuing threat to society."

The state responds that defendant's nineteenth and twentieth assignments are unpreserved and do not involve plain error, and, thus, this court should not consider them. On the merits, the state argues that defendant's theory of prejudice depends on a complicated chain of inferences that the jury was unlikely to have drawn from Wagner's fleeting reference to "soldiers" and "shock collars," terms that Wagner did not define or explain. Finally, the state observes

that Wagner did not testify that Hispanic gangs are more violent than white or African-American gangs, only that gangs within DOC institutions generally are organized by race.

As discussed, we review a trial court's decision whether to order a mistrial for abuse of discretion. *State v. Terry*, 333 Or 163, 175, 37 P3d 157 (2001); *Simonsen*, 329 Or at 300. In conducting that review, we recognize that "[t]he trial judge is in the best position to assess the impact of the complained-of incident and to select the means (if any) necessary to correct any problem resulting from it." *State v. Wright*, 323 Or 8, 12, 913 P2d 321 (1996). Where, as here, the defendant failed to object to questions or testimony that he now asserts were so prejudicial as to require the trial court, *sua sponte*, to order a mistrial, we first must determine whether any error is apparent on the face of the record. *State v. Montez*, 324 Or 343, 357, 927 P2d 64 (1996). As previously discussed, an error is "apparent on the face of the record" only when "the legal point is obvious, not reasonably in dispute." *Brown*, 310 Or at 355. As we have explained, "[a]pplying that standard, the trial court's failure to grant a mistrial *sua sponte* constitutes reversible error only if it is beyond dispute that [the complained-of] testimony was so prejudicial as to have denied [the] defendant a fair trial." *Montez*, 324 Or at 357; *see also Smith*, 310 Or at 24 ("Even if we find the prosecutor's remarks to be improper, tasteless, or inappropriate, we will not find an abuse of discretion in the trial court's denial of the motion for a mistrial unless the effect of the prosecutor's remarks is to deny a defendant a fair trial.").

Applying that standard, we conclude that defendant's assignments do not implicate plain error. Just before giving the testimony that defendant complains of, Wagner was asked how, generally speaking, gangs within DOC institutions are organized.[8] He answered that they were organized by race, including "white[,] Hispanic and black"

---

[8] This court has held that testimony regarding gangs inside prison is relevant to the inquiry under ORS 163.150(1)(b)(B) concerning a defendant's potential future dangerousness both to the society within the prison and to society at large. *See, e.g., State v. Sparks*, 336 Or 298, 323-24, 83 P3d 304, *cert den*, 543 US 893 (2004). Defendant does not contend otherwise.

gangs. Nothing in that answer supported an inference that Hispanic gangs were more dangerous than other racially-organized gangs. Wagner's later reference to "soldiers" and "shock collars" was made in response to a question regarding the "hierarchy within the Hispanic gangs within the prisons." Wagner did not explain those terms, and it is not clear whether the terms referred to different types of Hispanic gangs or to the roles of individual gang members.

Defendant asserts that the jury likely inferred that the terms referred to the roles of individual gang members and, having done so, the jury likely further reasoned that defendant would commit criminal violence in the future because he is Hispanic and because Hispanic gangs are particularly violent. We cannot say that it is obvious that the jury would draw those inferences or that it is "beyond dispute" that the prosecutor's questions and Wagner's testimony were "so prejudicial as to have denied defendant" a fair sentencing hearing under ORS 163.150. Accordingly, defendant's unpreserved assignments do not constitute "plain error," and we do not consider them further.

B. *Objection to Videotape of Melinda's Living Situation*

At the outset of the sentencing hearing, and outside the presence of the jury, the trial court stated on the record that "the defense has notified me that it objects to a video clip of [Melinda's] current living circumstances and I've indicated that I would let the state present that evidence, but I'm noting the defense objection for the record." Neither defendant nor the trial court stated the basis for that objection on the record.

Melinda later testified at the sentencing hearing. She described her life with defendant before his arrest in this case, and she also testified about how her life had changed after defendant's incarceration. To supplement her testimony, the state admitted a videotape, exhibit 240, that depicted Melinda's residence at the time of the sentencing hearing. Before admitting the videotape, the trial court asked defendant if he had any objection. Defense counsel answered "no, your honor."

In his twenty-first assignment of error, defendant argues that the trial court erred by "failing to make a record reflecting an exercise of discretion regarding the admission" of the videotape. Defendant's premise is that the trial court was obligated to make such a record because, to be admissible, the videotape had to meet the requirements of OEC 403 and the Eighth and Fourteenth Amendments to the United States Constitution. In essence, defendant's argument is that the prejudicial effect of the videotape on the jury outweighed whatever probative value it had and that the trial court erred by not making a record demonstrating that it had conducted the balancing test required by OEC 403 and the United States Constitution. "Had the court performed that duty," defendant concludes, "it would have found the evidence's substantial potential for prejudice greatly outweighed any minor probative value the evidence held."

The state responds that the assignment of error is unpreserved and does not involve plain error because (1) there is no indication in the record of the basis of defendant's initial objection to the videotape; and (2) when the trial court later asked defendant if he had any objections to the tape being played for the jury, defendant answered "no." Assuming that the basis for the objection was OEC 403, the state argues that the videotape was not unfairly prejudicial and that, even if it were, its admission was harmless because it merely duplicated the oral testimony that Melinda gave—without objection—describing how her living circumstances had improved following defendant's incarceration.[9]

The central premise of defendant's argument before this court—that the trial court was obligated to engage in the OEC 403 balancing test on the record—is his implicit and unsupported assertion that that rule, and the Eighth and Fourteenth Amendments, were the basis of his initial objection in the trial court. We cannot determine that from the record before us, however, and we decline to assume it on review. Accordingly, we reject defendant's twenty-first assignment of error.

---

[9] The state does not argue that, by answering "no" to the trial court's question whether he had any objection to exhibit 240, defendant waived his earlier objection to that evidence; accordingly, we do not address that possibility.

## IV.   CONCLUSION

As previously noted, we have considered defendant's other assignments of error, and we summarily reject them.

The judgment of conviction and the sentence of death are affirmed.